1    WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    Robert C. Gamez,                          No.  CV-12-0760-PHX-RCB (MEA)

10                     Plaintiff,

11         vs.                                        **O R D E R**

12   Charles Ryan, et al.,

13                     Defendants.

14

15         Plaintiff Robert C. Gamez, an inmate confined in the Arizona State Prison

16   Complex (ASPC) Browning Unit, in Florence, Arizona, brought this civil rights action

17   pursuant to 42 U.S.C. § 1983, alleging a single claim of excessive force on May 7, 2011,

18   in violation of the Eighth Amendment.  The remaining Defendants---Arizona Department

19   of Corrections (ADC) Correctional Officers Shilo Norris and Wesley Valentine---have

20   filed a Motion for Summary Judgment, which Plaintiff opposes.[1]  (Docs. 88, 103.)

21         The Court will grant the motion and terminate the action.

22   **I.     Legal Standards**

23         **A.     Summary Judgment**

24         A court "shall grant summary judgment if the movant shows that there is no

25   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

26   of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

27   _____

28         [1] The Court provided Plaintiff Notice pursuant *Rand v. Rowland*, 154 F.3d 952, 960 (9th Cir. 1998), regarding the requirements and consequences of a motion for summary judgment.  (Doc. 91.)

1    (1986).   Under summary judgment practice, the moving party bears the initial
2    responsibility of presenting the basis for its motion and identifying those portions of the
3    record, together with affidavits, which it believes demonstrate the absence of a genuine
4    issue of material fact.  *Id.* at 323.  If the moving party meets its initial responsibility, the
5    burden then shifts to the opposing party who must demonstrate the existence of a factual
6    dispute and that the fact in contention is material, i.e., a fact that might affect the outcome
7    of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
8    (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury
9    could return a verdict for the non-moving party.  *Id.* at 250; *Matsushita Elec. Indus. Co.,*
10   *Ltd. v. Zenith RadioCorp.*, 475 U.S. 574, 586-87 (1986).  The opposing party need not
11   establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed
12   factual dispute be shown to require a jury or judge to resolve the parties' differing
13   versions of the truth at trial."  *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S.
14   253, 288-89 (1968).

15           When considering a summary judgment motion, the court examines the pleadings,
16   depositions, answers to interrogatories, and admissions on file, together with the
17   affidavits or declarations, if any.  *See* Fed. R. Civ. P. 56(c).  At summary judgment, the
18   judge's function is not to weigh the evidence and determine the truth but to determine
19   whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  The evidence of
20   the non-movant is "to be believed, and all justifiable inferences are to be drawn in his
21   favor."  *Id.* at 255.  But, if the evidence of the non-moving party is merely colorable or is
22   not significantly probative, summary judgment may be granted.  *Id.* at 248-49.
23   Conclusory allegations, unsupported by factual material, are insufficient to defeat a
24   motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see*
25   *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory,
26   speculative testimony in affidavits and moving papers is insufficient to raise genuine
27   issues of fact and defeat summary judgment").

28   ///

**B.  Excessive Force---Eighth Amendment**

When a prison official is accused of using excessive force in violation of the Eighth Amendment, liability turns on whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm.  *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320-32 (1986)); *see also Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003). A showing of deliberate indifference is not enough.  *Whitley*, 475 U.S. at 320.  In determining whether the use of force was wanton and unnecessary, the Court must consider the following factors: (1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible official; and (5) any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7.

**II.  Motion for Summary Judgment**

**A.  Parties' Contentions**

In support of their motion, Defendants submit their Statement of Facts (Doc. 88 (DSOF)); Plaintiff's Adult Inmate Management Systems Report (AIMS) (*id.*, Ex. A), their declarations (Exs. D, Valentine Decl., Ex. E, Norris Decl.) and other exhibits.  In opposition, Plaintiff submits his Memorandum (Doc. 103), his Statement of Facts (Doc. 103-1 (PSOF)), and many exhibits, including grievance documents, Department Orders, documents related to disciplinary charges, and newspaper articles regarding prison conditions.

The record shows the following disputed and undisputed facts:

As preliminary matters, Plaintiff alleges that when he was admitted to ADC, mental health staff and security personnel knew that Plaintiff suffered from traumatic brain injury and frontal lobe dysfunction, which is associated with poor impulse control, aggression, and difficulty with self-reflection and empathy. (PSOF ¶ 4, Ex. A.)  He asserts that ADC security has classified him with a serious mental health needs score of 3R, which requires a routine level of psychiatric care.  (*Id.* Ex. B.)  Defendants assert that

Plaintiff is serving multiple sentences at ADC for 33 separate felony convictions, including 15 aggravated assaults, three armed robberies, three kidnappings and two attempted murders.  (DSOF ¶ 1.) Since his initial incarceration in 2002, he has been found guilty of 33 separate disciplinary infractions, including two assaults on staff, multiple acts of disobedience, one aggravated assault, taking an officer hostage with a weapon and various other aggressive behaviors. (DSOF ¶ 2.)  Plaintiff disputes this and claims that this is improper argument.  (PSOF ¶ 1.)

As to the incident in question, Plaintiff alleges that on May 7, Valentine was the floor officer responsible for matters such as escorting inmates to and from the shower. (PSOF ¶ 5.)   Plaintiff was placed in wrist restraints with his hands behind his back and Valentine escorted Plaintiff and another inmate to a separate tier for showers.  (PSOF ¶ 6.)  Plaintiff asked permission from Valentine to run upstairs to grab some Ibuprofen (IBU) from inmate Dongon.  (*Id.* ¶ 7.)  Plaintiff alleges that Valentine responded "yes, when you come back up" meaning that when Plaintiff was done showering, he could run upstairs to Dongon's cell.  (*Id.*)

When Plaintiff finished the shower, he complied with the wrist restraints, and, according to Plaintiff , the other inmate observed Valentine grant Plaintiff permission to go upstairs saying "yes, make it quick."  (*Id.* ¶ 8, see Doc. 24.)

Defendants assert that as Valentine was escorting Plaintiff to his cell in the Henry run of ASPC Florence Central Unit, Plaintiff broke away and ran to Ida run.  (DSOF ¶ 4.) Plaintiff disputes this, stating that he was being escorted from Fox-George run and had been given permission to grab IBU.  (PSOF ¶ 55.)  Defendants assert that Valentine directed Plaintiff to stop, Plaintiff did not stop, Plaintiff told Valentine "I don't give a f***, it makes no difference – I'm here for life," and he, instead, ran upstairs to Ida run. (DSOF ¶¶ 5-6). Plaintiff responds that he disputes the allegations in these paragraphs "insofar, that see: § 55." (PSOF ¶¶ 56, 57.)

Defendants further assert that Norris, who was nearby, followed Plaintiff and had a brief conversation with Plaintiff and told him to return to his cell.   (DSOF ¶¶ 7, 8.)

- 4 -

Plaintiff claims that Norris was already on Ida run collecting trays and that Plaintiff stopped at Dongon's cell.  (PSOF ¶ 58.)  Plaintiff disputes that Norris had a conversation with him and asserts that when Norris initiated contact, Plaintiff was standing handcuffed facing Dongon's cell speaking to Dongon when he was grabbed on his shoulder by Norris who interlocked his arm between Plaintiff's handcuffs and then viciously swung Plaintiff around.  (PSOF ¶ 59.)  Defendants assert that as Norris initiated a hands-on escort of Plaintiff, Plaintiff attempted to break free of the escort and thrust his head backwards, striking Norris on the right cheek. (DSOF ¶ 10.) Plaintiff asserts that he could not possibly have head butted Norris because he is not tall enough and he further argues that ADC Director's Order (DO) 804, Use of Force, prohibited Norris from using force and that Plaintiff was attacked and assaulted.  (PSOF ¶¶ 60, 61.)  Defendants assert that Norris immediately deemed it necessary to place Plaintiff on the ground to gain control and initiated a takedown. (DSOF ¶ 11.)  Plaintiff claims that Norris initiated the use of force when he grabbed Plaintiff.  (PSOF ¶ 62.)

Defendants allege that Valentine activated the Incident Command System (ICS) and called for additional staff and a supervisor.  (DSOF ¶ 12.)  Plaintiff disputes this and asserts that Valentine offers no evidence that it was he who activated the ICS.  (PSOF ¶ 63.)  Defendants assert that Norris was unable to render Plaintiff completely prone, as he struggled to stand and continued to strike backwards with his head. (DSOF ¶13.) Plaintiff disputes this saying that his wrist had been restrained behind his back and Dongon witnessed Norris go out of his way to initiate the assault by grabbing Plaintiff's shoulder and slamming him to the ground.  (PSOF ¶ 64.) Valentine also jumped on Plaintiff causing his face and head to hit the ground.  (*Id.*)    Defendants assert that Valentine assisted Norris in gaining control of Plaintiff by physically restraining his legs until additional staff arrived.  (DSOF ¶ 14.)  Plaintiff claims that he immediately cried out in pain as Norris sat on his back and told him to shut the hell up; Norris was making "diabolical sounds" and yanking and twisting Plaintiff's fingers trying to push the handcuffs over his head.  (PSOF ¶ 65.)  Valentine twisted Plaintiff's ankles and stepped

and bounced on his legs while Norris jumped on, punched and kicked Plaintiff.  (*Id.*)
Defendants assert that although Plaintiff's body fell to the ground in the takedown, his
head did not strike the ground. (DSOF ¶ 15.) Defendants assert that Valentine held
Plaintiff's legs while Norris held his arms and both told Plaintiff to stay down.  (DSOF ¶¶
16-17.)   As noted above, Plaintiff disputes these allegations.   (PSOF ¶¶ 66-68.)
Defendants assert that Plaintiff complied and remained facedown until Sergeant Moore
and COIIs Nguyen and St. George arrived to assist and relieve Valentine and Norris.
(DSOF ¶¶ 18-20.)  Plaintiff disputes this claiming he thought Defendants were going to
kill him, he was semi-conscious, and he could hear the entire pod banging on their cell
doors.  (PSOF ¶ 69.)  Plaintiff claims that the beating did not stop until additional staff
arrived and he could hear Moore arguing with "outraged" inmates.  (*Id.* ¶ 70.)  Plaintiff
contends that leg restraints were not used although they claim Plaintiff was kicking.  (*Id.*
¶¶ 70, 72.)

Because Plaintiff sustained a superficial abrasion on his back, Sgt. Moore directed
Nguyen and St. George to escort Plaintiff to the health unit for evaluation.  (DSOF ¶¶ 21-
22). Plaintiff was examined and determined to have no serious injuries. (DSOF ¶ 23).
Plaintiff asserts that he had swelling and bruising on the left side of his face, the right side
of his jaw, his lip, hands, ankles, and lower back and that he suffered confusion,
dizziness, and difficulty breathing.  (PSOF ¶ 72.) Plaintiff claims this exacerbated his
PTSD and depression.  He was given an ice pack and pain medication.  (*Id.*)

According to Defendants, Special Investigator Kathy Ingulli conducted a Criminal
Unit Investigation into Plaintiff's assault of Norris; she prepared CUI Report finding no
evidence in support of Plaintiff's claim that Norris and Valentine assaulted or used
excessive force in subduing Plaintiff.  (DSOF ¶¶ 29-43.)  Plaintiff disputes this, asserting
that he filed a grievance about the assault and while he was awaiting disciplinary
sanctions, he was visited by an investigator; Plaintiff waived his Fifth Amendment rights
and "invited" a recorded interview and gave the investigator the names of potential
witnesses.  (PSOF ¶ 80.)   He claims that as a result of the interview he was placed in the

1   same cell block as known enemies and viciously stabbed.  (*Id.*)  He also asserts that he

2   sought the taped interview in a motion for production and requesting sanctions for

3   spoliation of evidence.  (*Id.*; ref. Doc. 68.)

4       Defendants assert that Ingulli obtained a medical release and that a review of

5   Plaintiff's records revealed no indication that he complained of officer abuse to his

6   healthcare providers.  (DSOF ¶¶ 31-36.) In fact, the records from the evening of the May

7   7 incident indicate that he told medical personnel that he was in a fight with a peer.

8   (DSOF ¶ 33.) Plaintiff disputes this and asserts that it was later determined that the

9   medical files had been altered to minimize his injuries.  (PSOF ¶ 83.)  Defendants

10  maintain that no witness came forward during the investigation to support Plaintiff's

11  allegation of excessive force, including the inmate in cell 4 of Ida run, or any of the other

12  inmates on the Ida or Henry runs of ASPC Florence Central Unit. (DSOF ¶ 37).  Plaintiff

13  disputes this and claims that numerous inmates asked to be interviewed and the

14  surveillance cameras would have captured inmates willing to be interviewed but the tapes

15  were destroyed by Defendants.  (PSOF ¶ 88.)

16      According to Defendants, because of the length of Plaintiff's sentence, prosecution

17  for his assault of Norris was not an option; Ingulli recommended that Plaintiff receive

18  maximum loss of privileges.  (DSOF ¶ 43.)  Plaintiff disputes this and asserts that he was

19  the victim of excessive force and that the special investigator did not want to "open a can

20  of worms" by taking Plaintiff to trial.  (PSOF ¶ 94.)

21      Defendants argue that applying the *Hudson* factors, there are no triable issues of

22  fact to show that force was applied maliciously and sadistically.  (Doc. 88.)  In addition

23  to objecting to certain evidence, Plaintiff argues that he is mentally ill and that under

24  ADC policies, the use of force was improper.  (Doc. 103 ¶¶ 4, 19-21.)  Specifically, he

25  argues that force must not be used until every other reasonable attempt to neutralize has

26  been considered, patience is emphasized, and only a warden, deputy warden or designee

27  may authorize force due to an inmate refusing to move to another location and the inmate

28  is not harming himself or others or in possession of a weapon.  He asserts that use of

force is also governed by Ariz. Rev. Stat. § 13-414.  (Doc. 103 ¶ 20.)  He contends that DO 804 prohibits use of force against seriously ill inmates without prior authorization from a warden and a licensed mental health provider.  (*Id.* ¶ 21.)  He argues that Defendants saw Plaintiff's failure to obey the order to return to his cell as a sign of disrespect rather than a perceived threat.  (Doc. 103 at 17.)  He also argues that Defendants destroyed evidence and failed to conduct a proper investigation.  (PSOF ¶¶ 23-24, 40, 42-44.)  He moves to preclude their evidence and argues that he is entitled to a stay under Federal Rule of Civil Procedure 56(d) because he has identified evidence that would defeat summary judgment.  (Doc. 103 at 3; ref. Doc. 68.)

Defendants reply that Plaintiff's felony convictions come into evidence under Fed. R. Evid. 609(a)(1) and (b)(1) as they are probative of his history of violence towards others and are the foundation for establishing why he is where he is and why staff take extreme measures to manage him.  (Doc. 106 at 2.)  They assert that Plaintiff fails to establish that he is mentally ill.  (*Id.* at 3.)  In James P. Sullivan, Ph.D.'s May 29, 2003 Interim Report (produced at the request of Plaintiff's attorney in connection with his prosecution for a variety of felonies in Pima County case CR-2002 0991), there is an indication that he has "a verbal IQ in the low range (VIQ=84) with borderline verbal comprehension and adequate working memory."  (*Id.*; ref. PSFO ¶ 1, Ex. A.)  Sullivan found Plaintiff's performance on the Booklet Category Test impaired but drew no conclusions from this and merely suggested that the Court might be interested in additional testing. (*Id.*)  Plaintiff also produces a February 25, 2010 ADC Grievance Appeal Response that reflects he had been taking pills to treat his mental illness and that he desired other opportunities to address his mental health issues.  (*Id.*; ref. PSOF, Ex. B.)

Defendants also reply that in support of his entrapment theory, Plaintiff offers the December 14, 2011 declaration of convicted murderer and armed robber Eugenio Guerrero.  (*Id.* at 6; ref. PSOF Ex. C.)  According to both Plaintiff and Guerrero, Valentine agreed that Plaintiff could run upstairs to grab some Ibuprofen if he could "make it quick." (*Id.*)  Defendants argue that even if Guerrero heard what he thinks he

1     heard, he acknowledges he was not present at the time of the escort, and cannot confirm

2     or deny anything that Valentine said during his escort of Plaintiff.

3         Defendants assert that they produce evidence that Plaintiff did not comply with

4     Valentine's order to stop as he was running up the Ida run stairs and that he replied, "I

5     don't give a f***, it makes no difference – I'm here for life." (DSOF ¶6.) Defendants

6     further assert that even if Plaintiff believed that he had permission to go to another run,

7     he had no right to disregard subsequent orders that contradicted that prior permission.

8     They argue that Plaintiff was at best disobedient and at worst belligerent, threatening, and

9     aggressive towards officers and that they were entitled to apply force to compel

10    Plaintiff's compliance. (Doc. 106 at 8.)

11        **B.**     **Analysis**

12        The Court will grant Defendants summary judgment.

13          **1.**     **Preliminary Issues**

14        Plaintiff moves to strike Defendants' Motion for an Extension of Time to Reply

15    and to Strike the Reply. (Doc. 107.) Plaintiff claims that he did not receive a copy of the

16    motion or anticipated reply. But the motion and reply show a certificate of service by

17    mail with Notice of Electronic Filing to Plaintiff at the Browning Unit.[2] (Docs. 104,

18    106.) The motion for extension was granted by the Magistrate Judge. (Doc. 105.)

19    Plaintiff's Motion to Strike is denied.

20        As to Plaintiff's arguments regarding spoliation and failure to produce evidence,

21    the Court notes that the Magistrate Judge already denied Plaintiff's Motion for Sanctions

22    on this issue. (Docs. 68, 83.) The order notes that Defendants raised Plaintiff's security

23    risk as a reason to deny some of the discovery sought. (Doc. 83.) As to Plaintiff's request

24

25

26       [2] Although the reply is dated June 5, the certificate of service states that service was made on June 30. (Doc. 106.) The Court assumes this is a typographical error because Defendants' response to the Motion to Strike is dated June 26 and asserts that the reply was sent to Plaintiff in the normal course of business, nothing has been returned in the mail, and out of an abundance of caution, the reply was faxed and e-mailed to Plaintiff's counselor. (Doc. 109.) In addition, the Court notes that Plaintiff is not entitled to file a sur-reply and that Defendants raised no new matters in the reply.

27

28

1   for a stay, to the extent evidence does not exist, there is no need for a stay.  In addition
2   the Court notes that in a motion for summary judgment, the Court must view the evidence
3   in the light most favorable to the non-movant.

4          As to Plaintiff's complaints regarding an alleged failure to investigate or
5   complaints about the disciplinary hearing following charges based on the May 7 incident,
6   these matters are not claims raised in the Complaint.  Likewise, Plaintiff's claims that
7   Ryan, Hetmer, and Moore are liable because of their implicit approval of Valentine's and
8   Norris's actions (Doc. 103 at 5), is not a claim in the Complaint.

9          To the extent that as discussed below the Court relies on evidence to which either
10  party has objected, the Court overrules the objection.

11              **2.      No Constitutional Violation**

12         Applying the *Hudson* factors, the Court finds that there is no genuine dispute of
13  fact that the force used was applied in a good faith effort to restore order and not
14  maliciously or sadistically to cause harm.  *See Hudson*, 503 U.S. at 7.

15                  **a.      Extent of Injury**

16          The extent of a prisoner's injury may suggest whether the use of force could
17  plausibly have been thought necessary in a particular situation.  *Hudson*, 503 U.S. at 7.
18  Although the extent of a prisoner's injury is relevant in the use of force determination, it
19  is not decisive because a prisoner can state a claim even if he did not suffer a significant
20  injury.  *See id*. at 4; *Wilkins v. Gaddy*, 130 S. Ct. 1175 (2010); *Schwenk v. Hartford*, 204
21  F.3d 1187, 1196 (9th Cir. 2000) (the attack need not result in permanent injury).
22  "Otherwise, the Eighth Amendment would permit any physical punishment, no matter
23  how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."  *Hudson*,
24  503 U.S. at 9.  But not every "malevolent touch by a prison guard" or every push or
25  shove, gives rise to a federal cause of action.  *Id.*

26         Based on Plaintiff's assertions that he sustained swelling and bruising to his face,
27  lip, hands, jaw and ankle and dizziness and difficulty breathing, the Court finds that there
28  is some evidence of injury, although there is no evidence of lasting injury.  Because the

injury was moderate, the first factor weighs in Plaintiff's favor.  *See Hudson*, 503 U.S. at 10.

### b.     Need for Force

The Ninth Circuit has held that "the force that was applied must be balanced against the need for that force: it is the need for force which is at the heart of the [excessive force determination]."  *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994).  Where there is no need for force, any force used is objectively unreasonable for constitutional purposes. *See P.B. v. Koch*, 96 F.3d 1298, 1303-04 & n.4 (9th Cir. 1996).

Viewing the facts in the light most favorable to Plaintiff, Valentine told Plaintiff that Plaintiff could go upstairs to get IBU if he made it quick.  But there is no evidence that Valentine gave Plaintiff permission to go to the other inmate's cell *unescorted*.  More important, it is undisputed that when Plaintiff ran upstairs, Valentine ordered Plaintiff to stop and return to his cell and that he did not.  Plaintiff does not claim that Valentine did not give the order[3] and he does not dispute Valentine's assertion that Plaintiff's response was "I don't give a f***, it makes no difference – I'm here for life."

---

[3] In PSOF, he does not dispute that the order was given by Valentine (PSOF ¶¶ 56, 57), although he disputes that Norris spoke to him. In PSOF he disputes the allegations regarding Valentine's order to stop and to return to his cell by stating that he disputes the allegations "insofar, that see: § 55." Thus, his "dispute" regarding Valentine refers back to PSOF ¶ 55 and is actually limited to a dispute regarding where the incident took place---Henry run or Fox-George run. In his response memorandum, however, he confusingly states that he was never given an order and it is reasonable to believe that Defendants saw his failure to stop as a sign of disrespect and that they did not act out of a perceived threat but because they felt disrespected.  (Doc. 103 at 17.)  But that theory would only be consistent with Valentine having, in fact, given an order.  Moreover, Plaintiff never denies that he said "I don't give a f***, it makes no difference – I'm here for life."  To the extent that in his response memorandum Plaintiff attempts to deny that Valentine gave the order to stop and return to his cell, the denial is either unclear or a contradiction of PSOF.  In the Ninth Circuit, the general rule is that a party cannot create an issue of fact by contradicting his prior statements.  <u>Kennedy v. Allied Mut. Ins. Co.,</u> 952 F.2d 262, 266 (9th Cir. 1991).  The Court finds the contradiction is a sham.

1    Norris attests that he observed this interaction between Plaintiff and Valentine and

2    he approached Plaintiff and also told him to return to his cell.  Plaintiff disputes that

3    Norris spoke with him and claims that Norris grabbed his shoulder and interlocked his

4    arms between the handcuffs and swung Plaintiff around.  Norris admits that he initiated a

5    hands-on escort of Plaintiff.  Norris claims that Plaintiff attempted to break free; Plaintiff

6    admits that he made "an ill-conceived attempt to maintain his balance."  (Doc. 103 at 4

7    (PSOF ¶ 11.)  Norris also asserts that Plaintiff head butted him, but Plaintiff claims that

8    he was too short to do so and that he did not physically threaten Norris.  (PSOF ¶ 13,

9    Doc. 103 at 12.)  Norris attests that he deemed it necessary to get Plaintiff to the floor and

10   initiate a takedown.

11   The Ninth Circuit has ruled that the use of force may be a necessary "if a prisoner

12   refuses after adequate warning to move from a cell or upon other provocation presenting

13   a reasonable possibility that slight force will be required."  *Spain v. Procunier*, 600 F.2d

14   189, 195 (9th Cir. 1979).  The court reasoned that in such circumstances, even tear gas

15   could be a legitimate means to prevent small disturbances from becoming dangerous to

16   other inmates or the prison personnel.  (*Id.*)  In *Clement v. Gomez*, the court found no

17   Eighth Amendment violation where a small amount of pepper spray was used to quell

18   fighting in a cell, even though the spray affected bystander inmates.  298 F.3d 898, 903-

19   04 (9th Cir. 2002).  And the use of a chemical agent has been upheld "when reasonably

20   necessary to . . . subdue recalcitrant prisoners. . . ."  *Soto v. Dickie*, 744 F.2d 1260, 1270

21   (7th Cir. 1984); *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (mace can be

22   used in small quantities to control a recalcitrant inmate); *see also Howard*, 2010 WL

23   3785536, at *4 (citing *Soto* and *Spain* but not reaching the constitutional question

24   because the court found defendants were entitled to qualified immunity.)  In sum, that

25   Defendants were not dealing with a prison riot, or escape or hostage situation, or other

26   overt threat of physical harm does not mean that force could not be used.

27   Moreover, the Court rejects Plaintiff's suggestion that Defendants could not use a

28   takedown maneuver in the situation presented.  The policy language cited by Plaintiff ---

that "force may only be used after every other reasonable attempt to neutralize real or potential danger has been considered" and rejected---is simply too general to defeat summary judgment on an Eighth Amendment claim.  And the Court can find no reference in the polices regarding the need to have a warden or mental health professional approve force on a mentally ill inmate.  (PSOF, Exs. B, C.)  Even if Plaintiff was mentally ill in some way and that had some bearing on his conduct, violation of state policies does not create a federal constitutional claim.  Likewise, Ariz. Rev. Stat. 13-414, addresses only a state standard, not the Eighth Amendment.  Section 1983 does not provide a cause of action for violations of state law or state constitutional rights.  *Ybarra v. Bastian*, 647 F.2d 891, 892 (9th Cir. 1981).  Nothing in the ADC procedures offered by Plaintiff permits Plaintiff to refuse to obey orders and nothing forbids the use of force until a higher authority is present.  Also, it is irrelevant that Plaintiff may have believed that Valentine permitted him to run upstairs because it is undisputed that Valentine gave Plaintiff an order to stop and to return to his cell and he did not.  The only issue is whether Plaintiff offers evidence that grabbing him and using the take down maneuver and restraint was malicious and sadistic.

Here, Plaintiff's conduct—running upstairs unescorted, refusing to stop and return to his cell when ordered to do so by Valentine, and responding "I don't give a f***, it makes no difference – I'm here for life"—qualified Plaintiff as a recalcitrant inmate.  *See Howard*, 2010 WL 3785536, at *4.  According to Plaintiff, it was immediately after that and while Plaintiff was talking with Dongon at his cell when Norris made contact with him.  Even if Plaintiff did not head butt Norris, Plaintiff admits that he moved in attempting to keep his balance.  It was then that Norris used the take down manuever.

Although Plaintiff denies resisting, the incident was precipitated by Plaintiff's recalcitrance.  There is a legitimate penological interest in maintaining prison security in general and in protecting staff in particular.  In addition, "[w]hether in the context of a prison-wide disturbance or an individual confrontation between an officer and prisoner, corrections officers often must act immediately and emphatically to defuse a potentially

1   explosive situation," and they must make decisions in haste and under pressure.  *Jordan*
2   *v. Gardner*, 986 F. 2d 1521, 1528 (9th Cir. 1993).   Therefore, prison officials are
3   accorded great deference to execute measures when needed to maintain internal order and
4   security.  *Whitely*, 475 U.S. at 320-21; *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

5       Given the close proximity of Plaintiff and Defendants, the presence of other
6   inmates on the run, Valentine's order to stop and to return to the cell, and Plaintiff's
7   belligerent response to the order, the efforts to restrain Plaintiff were appropriate to
8   maintain security and order and were not the wanton infliction of pain.

9       This factor weighs in Defendants' favor.

10          **c.     Relationship between Need for Force and Force Used**

11      Regardless of the disruption, corrections officers must balance the need to
12   "maintain or restore discipline" through force against the risk of injury to an inmate.
13   *Hudson*, 503 U.S. at 6.  In analyzing the relationship between the need for force and the
14   force used, a simple overreaction by an officer is not enough to establish an Eighth
15   Amendment violation.   Under the Eighth Amendment, the standard is malicious and
16   sadistic force, not merely objectively unreasonable force, which is applicable under the
17   Fourth Amendment.  *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002); *see Hudson*,
18   503 U.S. at 9 (not every malevolent touch gives rise to an Eighth Amendment claim).
19   The infliction of pain in the course of a prison security measure is not cruel and unusual
20   punishment "simply because it may appear in retrospect that the degree of force
21   authorized or applied for security purposes was unreasonable, and hence unnecessary in
22   the strict sense."  *Whitely*, 475 U.S. at 319.   In other words, even if the take down and
23   restraint were not reasonably necessary to subdue Plaintiff, it does not amount to cruel
24   and unusual punishment unless the pain was inflicted "maliciously and sadistically for the
25   very purpose of causing harm."  *See id.*

26      Because Defendants have established that it was not wanton infliction of pain to
27   use the takedown and restraint for refusing an order to stop running unescorted and to
28   return to his cell, Plaintiff's burden—to show that the actual acts to restrain him

- 14 -

1    constituted the wanton and unnecessary infliction of pain—is extremely high.  *See*

2    *Whitley*, 475 U.S. at 325 (once it was established that an order to shoot low was not

3    wanton, prisoner's burden to show the actual shooting was wanton and unnecessary is

4    extremely high).  Plaintiff fails to meet this burden.

5         The Court has already rejected Plaintiff's claims that Defendants failed to follow

6    procedures.  It appears that the additional restraint of Plaintiff while he was on the ground

7    was brief; Plaintiff does not allege that there was a delay or long period between the take

8    down and the other officers arriving. And the undisputed evidence shows that Valentine

9    activated the ICS, which brought the other officers.  Plaintiff's objection is overruled;

10   Valentine can attest to his own actions, and Plaintiff offers nothing but speculation to

11   dispute Valentine's claim.  That Valentine activated the ICS bringing the other officers

12   suggests that the intent was merely to restrain Plaintiff.  Even if bouncing on Plaintiff's

13   legs or kicking him was an overreaction, that is not enough to establish an Eighth

14   Amendment violation.

15        This factor weighs in Defendants' favor.

16                          **d.      Threat Perceived**

17        "[T]he extent of the threat to the safety of staff and inmates, as reasonably

18   perceived by the responsible officials on the basis of the facts known to them" is also

19   relevant.  *Whitely*, 475 U.S. at 321.  The Court cautioned that with the ever-present

20   potential for violence, "a prison's internal security is peculiarly a matter normally left to

21   the discretion of prison administrators."  *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337,

22   349 n.14 (1981)).

23        As noted, Plaintiff concedes that he was in the run unescorted, talking to another

24   inmate at his cell, and that he refused the order to return to his cell.  Although there is no

25   evidence that Defendants were aware of Plaintiff's conviction or disciplinary records,

26   Plaintiff was in a super-maximum unit.  (Doc. 103 at 7.)  The AIMS report shows that

27   from March 14, 2011, to April 14, 2012, Plaintiff's classification was based on a custody

28   risk score of 5 and an institutional risk score of 5.  (Doc. 88, Ex. 1.)  Department Order

801, Inmate Classification, states that a score of 5 is the highest risk to the public, staff and other inmates of committing violence.[4]  (DO 801.06 § 1.1.)  Furthermore, placement in maximum custody pertains to inmates who commit or lead other inmates to commit violent or disruptive acts or who poses a serious threat to the security of the institution. (*Id.*, 801.09 1.2.1 and 1.2.3.)  Defendants were thus aware that they were dealing with an inmate whose security classification was maximum custody and who had thus been determined to be a serious threat to the security of the facility.

Contrary to Plaintiff's suggestions, Defendants were not required to continue to repeat orders or to patiently wait for Plaintiff to finish his business or to discuss and reject other alternatives to the force chosen.  They were not required to risk further escalation. For the reasons discussed above, Plaintiff's allegations are insufficient to rebut Defendants' claims regarding the perceived threat.  This factor weighs in Defendants' favor.

### e.    Efforts to Temper Force

The only force used here by Defendants was grabbing Plaintiff's shoulder, taking him to the floor, and the subsequent efforts to restrain him.  Valentine had already ordered Plaintiff to return to his cell and Plaintiff had refused to comply.  The Court finds that there was no lesser use of force available.

### f.    Conclusion

In sum, four of the five *Hudson* factors weigh in favor of Defendants.  The evidence, viewed in the light most favorable to Plaintiff, demonstrates that Plaintiff refused to stop running unescorted through the Unit, refused to obey an order to return to his cell, and responded by replying "I don't give a f***, it makes no difference – I'm here for life."  Defendants responded by initiating a hands-on escort and ended by taking Plaintiff to the floor and restraining him.  The evidence does not support a reliable inference that Defendants acted maliciously and sadistically for the very purpose of

---

[4] http://www.azcorrections.gov/Policies/800/0801.pdf, last visited June 17, 2013.

causing Plaintiff harm. The Court will grant summary judgment on the claim of excessive force.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendant's Motion for Summary Judgment (Doc. 88).

(2)     Defendant's Motion for Summary Judgment (Doc. 88) is **granted**.

(3)     Plaintiff's Motion to Strike (Doc. 107) is **denied.**

(4)     The action is terminated, and the Clerk of Court must enter judgment accordingly.

(5)     For the reasons set forth herein, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from the judgment in this action would not be taken in good faith.

DATED this 1st day of July, 2013.

Robert C. Broomfield
Senior United States District Judge